### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

ETSEGENET LEMMA and
ALULA KEBEDE,

    Plaintiffs,

    v.

CALATLANTIC GROUP, INC. *f/k/d/b/a*
*RYLAND HOMES*,

    Defendant/Third-Party Plaintiff,

    v.

NOEL'S FIRE PROTECTION, LLC,
PEED PLUMBING, INC. and
WILLIAM H. METCALFE & SONS, INC.,

    Third-Party Defendants.

Civil Action No. TDC-18-2353

### MEMORANDUM OPINION

Plaintiffs Etsegenet Lemma and Alula Kebede have filed a civil action against Defendant CalAtlantic Group, Inc., formerly doing business as Ryland Homes ("CalAtlantic"), alleging breaches of statutory, express, and implied warranties, negligent misrepresentation, negligence, detrimental reliance, breach of contract, and violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13–301 (LexisNexis 2021), in connection with Lemma's purchase from CalAtlantic of a newly constructed house. CalAtlantic has filed a third-party complaint against Third-Party Defendants Noel's Fire Protection, LLC ("Noel's"), Peed Plumbing, Inc. ("Peed"), and William H. Metcalfe & Sons, Inc. ("Metcalfe") (collectively, "the Third-Party Defendants"), alleging claims for contractual indemnity. Presently pending before the Court are (1) CalAtlantic's Motion for Partial Summary Judgment; (2) Plaintiffs' Cross Motion

for Partial Summary Judgment as to Counts I, II, and VI of the Amended Complaint as to Liability; and (3) the Third-Party Defendants' Motion for Summary Judgment, which are all fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, CalAtlantic's Motion will be GRANTED IN PART and DENIED IN PART, Plaintiffs' Cross Motion will be GRANTED, and the Third-Party Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.   Construction Contracts

In 2015, Ryland Homes ("Ryland") constructed a single-family home on Doc Berlin Drive in Silver Spring, Maryland ("the Property"). On December 29, 2015, Ryland sold the Property to Lemma for $590,000.

In the process of constructing the Property, Ryland contracted with three companies relevant to this case: Noel's, which installed fire sprinklers; Peed, which performed plumbing installation work; and Metcalfe, which installed a heating, ventilation, and air conditioning ("HVAC") system.

### A.   The Noel's Subcontract

Under the terms of the April 1, 2015 subcontract between Ryland and Noel's ("the Noel's Subcontract"), Noel's agreed to install a sprinkler system pursuant to certain labor and material specifications. Noel's agreed that it would "supply all labor, supervision, tools, equipment and materials necessary to perform phase as required by plans" and that the construction "must be done in conformance with all manufacturer installation instructions, specifications, local codes, OSHA requirements and Ryland Homes safety standards." Joint Record ("J.R.") 1, ECF No. 145. The Noel's Subcontract further provided that:

2

> Subcontractor is responsible for any damages incurred to building or site as a result of work done on site. Any future charges resulting from the repair or replacement of these items is the responsibility of the Subcontractor.

J.R. 4. Finally, the "Standards/Warranties" section of the Noel's Subcontract stated:

> Subcontractor must guarantee all labor and material for a minimum of two (2) years after settlement to include Ryland Homes' models. Additionally, the Subcontractor shall provide 24-hour emergency service for calls requiring immediate assistance. If field inspection reveals improper material or workmanship, Subcontractor will assume all liability for any future charges incurred in the correction of this work.

*Id.*

## B.    The Peed Subcontract

Under the terms of the February 3, 2014 subcontract between Ryland and Peed ("the Peed Subcontract"), Peed agreed to install the plumbing for the Property pursuant to certain labor and material specifications. Peed agreed that it would "supply all labor, supervision, tools, equipment, and materials necessary to perform phase as required by plans" and that the construction "must be done in conformance with all manufacture[r] specifications, local codes, manufacturer's installation instructions, OSHA requirements and Ryland Homes safety standards." J.R. 119. The Peed Subcontract further provided that:

> The Subcontractor is responsible for any damages incurred to building or site as a result of work done on site. Any future charges resulting from the repair or replacement of these items are the responsibility of the Subcontractor.

J.R. 124. Finally, the "Standards/Warranties" section of the Peed Subcontract stated that:

> Subcontractor must guarantee all labor and material for a minimum of two (2) years after settlement to include Ryland Homes' models. If field inspection reveals improper material or workmanship, subcontractor will assume all liability for any future charges incurred in the correction of this work.

J.R. 125.

3

### C.     The Metcalfe Subcontract

Under the terms of the August 18, 2015 subcontract between Ryland and Metcalfe (the "Metcalfe Subcontract") pursuant to which Metcalfe installed the HVAC system at the Property, Metcalfe agreed to conform to "labor and material specifications" and to "supply all labor, supervision, tools, equipment and materials necessary to perform its contracted phase of construction" and that its work "must be performed in conformance to generally accepted industry standards and with all specifications, scopes of work, applicable building codes, manufacturer installation instructions/recommendations and OSHA, VOSH (VA), MOSH (MD) and Ryland Homes' safety standards." J.R. 31. Metcalfe further agreed to "[p]rovide daily field supervision to oversee" the work and to "provide quality control to guard against and correct defective materials and inferior workmanship." *Id.* Under the "Warranty/Customer Service" section of the Metcalfe Subcontract, the parties agreed that:

A.  Subcontractor shall warrant the new home, to include model homes, against defects in materials and workmanship according to the applicable Contractor Agreement.

B.  Subcontractor shall fully cooperate with Ryland Homes in responding to warranty claims to include field inspections and any subsequent repair(s).

C.  For non-emergency warranty claims, Ryland Homes will make every effort to provide the Subcontractor with ten (10) business days advanced notice of any appointments during normal business hours. Confirmation of work order receipt and appointments are required and appreciated.

D.  For emergency warranty claims, Subcontractors shall respond **as soon as possible and no later than 24-hours from notification.** Emergencies are defined as any life-safety issue and any of the following circumstances:

***

4

3. HVAC: When there is no heat anywhere in the home. Air conditioning failure may be considered an emergency during times of extreme heat AND where there is a health safety threat to someone in the home.

J.R. 33.

### D.     The 2017 Master Subcontract Agreements

On October 1, 2015, CalAtlantic merged with the Ryland Group, Inc. and became Ryland's successor for purposes of the Noel's, Peed, and Metcalfe Subcontracts. On April 24, 2017, CalAtlantic and Noel's entered into a standard form Master Subcontract Agreement (the "2017 Noel's Master Subcontract") governing all work conducted by Noel's for CalAtlantic. Likewise, on May 18, 2017, CalAtlantic and Metcalfe entered into the same standard form Master Subcontract Agreement ("the 2017 Metcalfe Master Subcontract"). Both the 2017 Noel's Master Subcontract and the 2017 Metcalfe Master Subcontract (collectively, "the 2017 Master Subcontracts") contained the same indemnification provision, set forth in paragraph 25, which stated in part:

> Subcontractor shall, to the fullest extent permitted by Law, defend (at Subcontractor's sole cost and expense and with legal counsel approved by Contractor), indemnify and hold harmless Contractor . . . for, from and against any and all claims, demands, obligations, actions, causes of action, suits, judgments, awards, fines, penalties, liens, damages of any type (including, without limitation, bodily injury, emotional injury, death, property damage, costs to repair, diminution in value and any other consequential or incidental damages), costs, expenses, actual attorneys' fees, consultants' fees, experts' fees (including attorneys' fees, consultants' fees, and experts' fees incurred by the Indemnitee in enforcing this Paragraph 25), losses or liability, at Law or in equity, of every kind and nature whatsoever, whether or not well founded ("Claims") directly or indirectly arising out of or in any way connected with Subcontractor's Work or Subcontractor's other operations on, about, or otherwise relating to any Project . . .

J.R. 18–19 (Noel's), 112–13 (Metcalfe). The term "Work" is defined in paragraph 1(t) of both 2017 Master Subcontracts as "the work to be performed and the services, labor and materials to be supplied by Subcontractor for the Project." J.R. 7 (Noel's), 101 (Metcalfe). The term "Project" is

defined as "the construction project being carried out at the specific location where the Work is to be performed as defined in the Work Agreement or other Work Document" and "includes the Work and all other work to be performed by Contractor and other subcontractors at that location." J.R. 7 (Noel's), 101 (Metcalfe).

The 2017 Master Subcontracts also included a provision entitled, "Projects Purchased from other Builders," which stated that:

> If Contractor purchases a Project from another Person and such Person assigns its contract with Subcontractor for that Project to Contractor, Subcontractor shall be bound by the terms and conditions of this Agreement with respect to that Project. In the event of a conflict between the terms of the assigned contract and the terms of this Agreement, the terms of this Agreement shall control.

J.R. 8–9 (Noel's), 102–03 (Metcalfe).

The 2017 Master Subcontracts also stated that:

> Work performed after the date of this Agreement, regardless of whether performed pursuant to a Work Agreement or Work Document issued before or after the date of this Agreement, will be governed by the terms of this Agreement. Work performed prior to the date of this Agreement will be governed by the terms of the applicable agreements effective as of the time of performance of such work.

J.R. 22 (Noel's), 116 (Metcalfe).

## II.    The Warranty

On November 22, 2015, Lemma entered into an Agreement of Sale with Ryland to purchase the Property ("the Sale Agreement"). On December 29, 2015, Lemma closed on the purchase of the Property, and Lemma and Ryland executed a Home Warranty Enrollment Form, under which Ryland "certifie[d] that the home is in compliance with all approved Ryland standards, has been properly inspected and all necessary approvals for processing of the home ha[ve] been obtained." J.R. 308. Under the main terms of Ryland's New Home Warranty ("the Warranty"), Ryland warranted that the property would be "free from any defects in material and

6

workmanship" for one year, "free from any defect in the electrical, plumbing, heating, cooling, and ventilating systems" for two years, "free from any structural defects" for five years, and "free from any major structural defects" for ten years. J.R. 217.

## III.   Property Damage

Lemma moved into the Property on January 3, 2016. Kebede also resided at the Property. In May 2016, Lemma first observed cracks in and water leaking from the foyer ceiling. Lemma called CalAtlantic's home emergency number and waited two days until CalAtlantic sent a worker to the Property. The worker patched the ceiling, inspected the bathrooms at the Property, caulked the second-floor bathroom, and stated that the problem was fixed. In May 2016, Lemma also observed a crack above the kitchen island that went along a large portion of the main floor. After Lemma contacted CalAtlantic, its representative informed her that the issue had been resolved when the second-floor bathroom was caulked.

Over the next two years, Lemma encountered additional problems with the Property. On September 12, 2016, the floor of the master bedroom began shaking when she stepped on it. When Lemma reported this issue, a CalAtlantic representative stated that the shaking was the result of settling at the Property and a dresser in the master bedroom, and that the issue would soon subside. On September 24, 2016, the kitchen ceiling opened up and water poured out. In May 2017, on two occasions, water leaked from the ceiling above the front hallway and foyer. After Lemma reported each of these leaks, CalAtlantic caulked the second-floor bathroom and stated that the issue had been resolved.

On August 14, 2017, Lemma observed water damage in the kitchen ceiling and also identified a smell permeating throughout the Property. After Lemma contacted CalAtlantic again, Ed Myers, CalAtlantic's representative, did not visit the Property until August 24, 2017. When

7

Myers cut open the kitchen ceiling and the bathroom wall, he discovered mold growing at the Property. However, he told Lemma and Kebede that it was safe to continue to reside there. After seeing a sprinkler pipe behind the drywall, Myers contacted Noel's to investigate. The same day, Noel's discovered a leak at a glue joint in the sprinkler system, and on August 28, 2017, Noel's repaired it.

In or about September 2017, CalAtlantic determined that there were active water leaks coming from the supply line for the sprinkler system and from the shower drain in the second-floor hallway bathroom and then repaired the leaks. CalAtlantic also arranged for an environmental consultant, Environmental Solutions, Inc. ("ESI"), to inspect the Property and propose a mold remediation plan. After CalAtlantic arranged for another contractor to perform the remedial work, ESI reinspected the Property in April and May 2018 and determined that it was clear of health or environmental issues.

On November 19, 2018, Rothfuss Engineering Company, a forensic consulting company retained by Lemma, inspected the Property and then prepared a report concluding that the HVAC unit was "likely undersized and [could not] adequately condition the house," which in turn can lead to mold growth. Similarly, on December 15, 2018, a different consulting company, Environmental, Health and Safety Management Consulting ("EHSMC"), inspected the Property on behalf of Lemma and prepared a report concluding that an undersized HVAC unit caused inadequate ventilation in the Property, resulting in high humidity conducive to mold growth and damage to furniture. In contrast, EFI Global, Inc. ("EFI Global"), an engineering company retained by Metcalfe's insurer, concluded in its February 14, 2021 report that the "HVAC system did not cause or contribute to the mold growth in the house due to an improper design or improper installation." J.R. 662.

8

According to Lemma, as a result of exposure to the mold, she developed upper respiratory issues and vocal issues. Kebede developed a cough, sneezing, and irritations in his eyes, and he was hospitalized for chest pain and shortness of breath. The water leaks and mold at the Property also caused Lemma to suffered thousands of dollars in damage to furnishing, artwork, and personal items.

## IV.    Procedural History

On July 31, 2018, Lemma and Kebede filed the present civil action against CalAtlantic. The presently operative Amended Complaint alleges the following causes of action. In Count 1, Lemma alleges a breach of a statutory warranty because CalAtlantic failed to comply with the minimum warranty requirements set forth in state and county law, Md. Code Ann., Real Prop. § 10–604 (LexisNexis 2015); Montgomery County Code § 31C-3(c), as well as a breach of the express warranty contained in the rider to the Sale Agreement. In Count 2, Lemma alleges a breach of an implied warranty under the Real Property Article of the Maryland Code, Md. Code Ann., Real. Prop. § 10–203. In Count 3, Plaintiffs allege that CalAtlantic engaged in negligent misrepresentation by stating to them that the Property was fixed after each complaint and visit by CalAtlantic that failed to resolve the problem. In Count 4, Plaintiffs allege negligence based on CalAtlantic's failure to properly inspect the Property and perform necessary repairs in a timely manner. In Count 5, Plaintiffs allege detrimental reliance, in that they reasonably relied on CalAtlantic's representations and assurances, which resulted in damages to their persons and property. In Count 6, Lemma asserts a breach of contract by CalAtlantic based on the failure to comply with the warranties specified in the Sale Agreement and its riders. In Count 7, Plaintiffs allege that CalAtlantic violated the MCPA by making false and misleading representations in the sale of the Property and during the subsequent visits to address the leaks.

On March 5, 2019, CalAtlantic filed its Third-Party Complaint against the Third-Party Defendants, alleging contractual indemnity based on the terms of the Noel's Subcontract, the Peed Subcontract, the Metcalfe Subcontract, and the 2017 Master Subcontracts. On January 27, 2022, discovery concluded with the deposition of Kebede.

## DISCUSSION

Each party presently seeks summary judgment on some or all of its claims. In its Motion for Partial Summary Judgment, CalAtlantic seeks summary judgment in its favor on Plaintiffs' MCPA claims. In their Cross Motion for Partial Summary Judgment, Plaintiffs seek summary judgment on their breach of warranty and breach of contract claims in Counts 1, 2, and 6. In their Motion for Summary Judgment, the Third-Party Defendants seek summary judgment on the contractual indemnity claims against them.

### I.    Legal Standard

Under Federal Rule of Civil Procedure 56(a), the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing a motion, the Court must believe the evidence of the nonmoving party, view the facts in the light most favorable to the nonmoving party, and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "A material fact is one 'that might affect the outcome of the suit under the governing law.'" *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248). A dispute of material fact is "genuine" only if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248–49.

10

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

## II.    CalAtlantic's Motion for Partial Summary Judgment

In its Motion for Partial Summary Judgment, CalAtlantic argues that (1) because Kebede is not a "consumer" covered by the MCPA, Count 7 should be dismissed as to Kebede; and (2) more broadly, Plaintiffs cannot assert a valid claim under the MCPA because their claim is based on statements made after, not during, the sale of the Property. Because Kebede does not oppose CalAtlantic's first argument, the Motion will be granted as to Kebede.

As relevant here, the MCPA prohibits the use of an "unfair, abusive, or deceptive trade practice" in "[t]he sale, lease, rental, loan or bailment of any consumer goods, consumer realty, or consumer services" or "the offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services." Md. Code Ann., Com. Law § 13–303(1)–(2). "Service" is defined as any "[b]uilding repair or improvement service," "[s]ubprofessional service," "[r]epair of a motor vehicle, home appliance, or other similar commodity" or "[r]epair, installation, or other servicing of any plumbing, heating, electrical, or mechanical device." *Id.* § 13–101(j).

To state a claim under the MCPA, a plaintiff must adequately plead that (1) the defendant engaged in an unfair or deceptive practice or misrepresentation in the sale or offer for sale of consumer goods, realty, or services; (2) the plaintiff relied upon the representation; and (3) doing so caused actual injury. *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 277 (Md. 2007); *Morris v. Osmose Wood Preserving*, 667 A.2d 624, 635–36 (Md. 1995); *see also Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012).

11

In the Amended Complaint, Lemma has asserted that her MCPA claim is based on both the representation "upon the sale of the Property that it was of a particular standard which it was not," as well as statements made during the subsequent course of conduct with CalAtlantic during which CalAtlantic repeatedly failed to discover and address the leaks but reassured her that the problems were fixed. Am. Compl. ¶¶ 168, 186, ECF No. 31.

As to the first argument, Lemma has identified sufficient evidence of an unfair misrepresentation relating to the sale of consumer realty, specifically, the statement in the Warranty that the Property was "free from any defect in the electrical, plumbing, heating, cooling, and ventilating systems" for two years, J.R. 217, and the statement in the Ryland Warranty Home Enrollment Form certifying "that the home is in compliance with all approved Ryland standards, has been properly inspected and all necessary approvals for processing of the home ha[ve] been obtained," J.R. 308. Where there is substantial evidence that the Property had multiple leaks, there is at least a genuine issue of material fact on whether it was free from defects in the plumbing system, whether CalAtlantic properly inspected the Property, and whether it was in compliance with the relevant standards. Lemma plainly relied on this representation and has presented sufficient evidence of personal injury and property damage as a result of her reliance. Thus, on this basis alone, the Motion will be denied as to the MCPA claim.

As for CalAtlantic's claim that the MCPA claim cannot be based on alleged misrepresentations made during the subsequent visits to address the water damage, the Court agrees that the MCPA does not apply to such statements. The sale of the Property was a sale of "consumer realty," Md. Code Ann., Com. Law §§ 13-101(d)(1), 13–303(2), and by including a warranty that promised to provide repair services to address any defects, the sale arguably also provided "consumer services" under the MCPA, consisting of either "[b]uilding repair or

improvement service" or the "[r]epair, installation, or other servicing of any plumbing, heating, electrical, or mechanical device," *id.* § 13–101(j)(4). However, the misrepresentations at issue must occur "in . . . [t]he sale" or "offer for sale" of the consumer realty or services. *Id.* § 13-303(1)–(2). In *Morris v. Osmose Wood Preserving*, 667 A.2d 624 (Md. 1995), the Court of Appeals of Maryland cautioned that this provision of the MCPA applied only to unfair or deceptive trade practices or misrepresentations made "in" the sale and did not "sweep as broadly" as another statute that covered unlawful practices made "in connection with the sale[]" of goods. *Id.* at 636. In another instance, the Maryland Court of Appeals held that in the context of an MCPA claim by a tenant against a landlord, the MCPA "applies to a lease at the time the consumer enters into it" and "is intended to govern deceptive trade practices which induce the prospective tenant to enter into such a lease," but "we do not believe the legislature intended the [M]CPA to be applicable to statements or omissions concerning the leased premises occurring during the term of the lease." *Richwind Joint Venture 4 v. Brunson*, 645 A.2d 1147, 1157–58 (Md. 1994), *overruled on other grounds by Brooks v. Lewin Realty III, Inc.*, 835 A.2d 616, 617 (Md. 2003). Relying on *Morris* and *Richwind*, another judge in this District has concluded that "Section 13–303 does not bar unfair or deceptive trade practices in the performance or delivery of consumer services after a sale has occurred." *Barranco v. Chesaco Motors, Inc.*, No. 18-989, 2019 WL 423402, at *3 (D. Md. Feb. 1, 2019).

Although Plaintiffs are correct that *Richwind* and *Barranco* are factually distinguishable, they have identified no authority supporting the conclusion that the MCPA can apply to statements made several months after the sale, even if made by the original seller and even if related in some way to services promised in the original sale, that could not have induced the original transaction. The Court finds that even viewing the facts in the light most favorable to Lemma, the statements

by CalAtlantic's representatives on visits to the Property several months after the sale of the Property were, at best, made "in connection with" the sale of the Property, not "in" the sale. *Morris*, 667 A.2d at 636. Where the Maryland Court of Appeals has held that statements made "in connection with" a sale are insufficient, the Court finds that Lemma cannot prevail on an MCPA claim based on these post-sale statements. *See id.* CalAtlantic's Motion for Partial Summary Judgment on the MCPA claims will therefore be granted as to the statements made by CalAtlantic representatives at the Property from May 2016 forward.

**III.     Plaintiffs' Cross Motion for Partial Summary Judgment**

In Plaintiffs' Cross Motion for Partial Summary Judgment, Plaintiffs seek judgment as a matter of law on the issue of liability against CalAtlantic on the breach of warranty and breach of contract claims in Counts 1, 2, and 6 on the grounds that there is no genuine dispute of material fact. Although CalAtlantic argues that Lemma did not specifically identify the warranties and contracts at issue, the record is clear that both express and implied warranties applied to the construction of the Property, which included the sprinkler and plumbing systems. As to the express warranty, the Sale Agreement included a rider signed by Lemma and Ryland, entitled "State Rider (Maryland)," that includes a paragraph entitled "Builder's New Home Warranty" stating that, as required by Maryland law, the Property has "minimum warranty coverage" that provides that for one year, it is "free from any defects in material and workmanship"; for two years, it is "free from any defect in the electrical, plumbing, heating, cooling, and ventilating systems," subject to certain exceptions; for five years, it is "free from any structural defects"; and for ten years, it is "free from any major structural defects." J.R. 217. The Warranty was required to comply with Maryland law, which provides that "a new home warranty provided under a new home warranty security plan shall warrant at a minimum that: (i) For 1 year, beginning on the warranty date, the new home

14

is free from any defects in materials and workmanship; (ii) For 2 years, beginning on the warranty date, the new home is free from any defect in the electrical, plumbing, heating, cooling, and ventilating systems, except that in the case of appliances, fixtures and items of equipment, the warranty may not exceed the length and scope of the warranty offered by the manufacturer; and (iii) For 5 years, beginning on the warranty date, the new home is free from any structural defect." Md. Code Ann., Real Prop. § 10–604(a)(1).

Further, Lemma and Ryland both signed the "Ryland Home Warranty Enrollment Form" which stated in part that "Ryland certifies that the home is in compliance with all approved Ryland standards, has been properly inspected and all necessary approvals for processing of the home ha[ve] been obtained." J.R. 308. Under Maryland law, when there is "[a]ny written affirmation of fact or promise which relates to [an improvement to real property] and is made a part of the basis of the bargain between the vendor and the purchaser," then "an express warranty that the improvement conforms to the affirmation or promise" is created. Md. Code Ann., Real Prop. § 10–202(a)(1).

Beyond the express warranty, under Maryland law, there is an implied warranty associated with any sale of real property that any completed improvement to the property is: "(1) Free from faulty materials; (2) Constructed according to sound engineering standards; (3) Constructed in a workmanlike manner; and (4) Fit for habitation." *Id.* § 10–203(a).

As for whether there was a breach of the express and implied warranties, it is undisputed that in May 2016, only a few months after Lemma moved into the Property, cracks started to appear and water began leaking within the Property, and that the leaking continued at least until August 2017. As stated in the September 5, 2017 ESI report, the leaking came from the sprinkler system and the plumbing, and CalAtlantic has presented no evidence to the contrary. Indeed, the

15

December 15, 2018 report by EHSMC and the February 14, 2021 report by EFI Global both confirm that leaks came from the fire sprinkler system and from the plumbing. Whether it was CalAtlantic or a subcontractor which was ultimately responsible for the leaks, there can be no dispute that the Property was not "free from any defects in material and workmanship" in the fire sprinkler system or in the plumbing system, J.R. 217, and that those parts of the Property were not constructed "in a workmanlike manner." Md. Code Ann., Real Prop. § 10–203(a).

CalAtlantic argues that even though there were defects in the construction, the fact that it responded to the complaints and arranged for work to be performed that eventually resolved the issues three years later in May 2018 demonstrates that there was no breach of the warranty. A breach of a warranty, however, occurs when a product fails to conform to the warrantor's representations. *Hacker v. Shofer*, 248 A.2d 351, 354 (Md. 1968). To establish a breach of warranty, a purchaser "need only show the existence of the warranty, its breach, and resulting damage." *Starfish Condo. Ass'n v. Yorkridge Serv. Comm'n*, 458 A.2d 805, 814 (Md. 1983). Because it is undisputed that leaks from the sprinkler system and plumbing occurred at the Property only months after Lemma moved into the Property, and there is no claim or evidence demonstrating that they were caused by any activity other than defective construction, there is no genuine issue of material fact on whether CalAtlantic breached both the express and implied warranties at issue in this case.

As for the breach of contract claim in Count 6, Lemma makes the same argument, that she is entitled to summary judgment because CalAtlantic breached the express and implied warranties. A warranty is "a statement or representation made by the seller of goods, contemporaneously with and as a part of the contract of sale, although collateral to the express object of it, . . . by which the seller promises or undertakes to insure that certain facts are or shall be as the seller then represents

16

them." 19A Md. L. Encyclopedia, Sales of Personalty § 38 (2022). Under Maryland law, a breach of an implied or express warranty is also a breach of contract. *See Morris*, 667 A.2d at 631 ("[Purely economic] losses are often the result of some breach of contract and ordinarily should be recovered in contract actions, *including actions based on breach of implied or express warranties*." (emphasis added)); *Lloyd*, 916 A.2d at 291. Thus, for the same reasons discussed above in relation to the breach of express and implied warranty claims, there is no genuine issue of material fact on whether CalAtlantic breached its contract with Lemma.

To be sure, there are factual disputes on damages. For example, Plaintiffs argue that mold in the basement was ultimately caused by the defective construction because it resulted when the CalAtlantic representative opened the ceiling in August 2017, causing mold traceable to the leaks to migrate into the basement, and that the mold problem was exacerbated by inadequate ventilation in the basement resulting from an undersized HVAC unit and CalAtlantic's failure to test for mold in the basement. In contrast, CalAtlantic, citing the report by EFI Global, argues that the mold in the basement was caused by the removal of an air duct during unrelated construction work arranged by Lemma after she moved into the Property. CalAtlantic also asserts that Lemma did not permit it to repair the leaks between September 2017 and April 2018. Although there are genuine issues of material fact on damages, these disputes do not affect the underlying determination that CalAtlantic is liable for breach of warranty and breach of contract. Plaintiffs' Cross Motion for Partial Summary Judgment on Counts 1, 2, and 6 will therefore be granted.

## IV.     Third-Party Defendants' Motion for Summary Judgment

In their Motion for Summary Judgment, the Third-Party Defendants argue that there is no applicable contractual indemnification provision in their respective contracts with CalAtlantic. Under Maryland law, courts are to follow "the law of objective contract interpretation, which

provides that '[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding.'" *Dumbarton Improvement Ass'n v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Slice v. Carozza Properties, Inc.*, 137 A.3d 687, 693 (Md. 1958)). A court must therefore seek to "determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* (quoting *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306, 1310 (Md. 1985)). In interpreting contractual language, "the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003). "[T]he contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Dumbarton Improvement Ass'n*, 73 A.3d at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)).

A.   **The 2017 Master Subcontracts**

In arguing that the Third-Party Defendants are liable for contract indemnification, CalAtlantic focuses primarily on the identical indemnification clauses of the 2017 Master Subcontracts. Noel's and Metcalfe argue that the 2017 Master Subcontracts are inapplicable because they were signed in 2017, two years after the work performed by Noel's and Metcalfe.

Under the indemnification clauses in the 2017 Master Subcontracts, Noel's and Metcalfe agreed to indemnify CalAtlantic for claims "directly or indirectly arising out of or in any way connected with Subcontractor's Work or Subcontractor's other operations on, about, or otherwise

18

relating to any Project." J.R. 19, 113. However, upon review of the entirety of the 2017 Master Subcontracts, the Court concludes that they do not apply to the claims in this case. Both were signed in 2017, two years after Noel's and Metcalfe installed the sprinkler system and HVAC system, respectively. The 2017 Master Subcontracts specifically state that while they superseded prior agreements regarding "the matters contained herein," "Work performed prior to the date of this Agreement will be governed by the terms of the applicable agreements effective as of the time of performance of such Work." J.R. 22, 116. Under the plain language of this provision, the 2017 Master Subcontracts do not apply to the work performed by Noel's and Metcalfe in 2015.

The conclusion that the 2017 Master Subcontracts do not apply to work that pre-dated their execution is bolstered by their other provisions. "Work" is defined in the 2017 Master Subcontracts in the future tense as "the work *to be performed* and the services, labor and materials *to be supplied* by Subcontractor for the Project." J.R. 7, 101 (emphasis added). Similarly, "Project" is defined in the present and future tenses as "the construction project *being carried out* at the specific location where the Work *is to be performed* as defined in the Work Agreement or other Work Document" and "includes the Work and all other work *to be performed* by Contractor and other subcontractors at that location." J.R. 7, 101. Notably, while each of the 2017 Master Subcontracts has a provision stating that it would apply "[i]f Contractor purchases a Project from another Person and such Person assigns its contract with Subcontractor for that Project to Contractor," J.R. 8, 102, under the plain language of that provision, which does not use the past tense, it does not apply to projects, such as the present one, which CalAtlantic purchased before the execution of the 2017 Master Subcontracts. Read together, the terms of the 2017 Master Subcontracts establish that they do not apply to the work performed by Noel's and Metcalfe in 2015.

As to Noel's, CalAtlantic further argues that the 2017 Noel's Master Subcontract, including its indemnification provision, applies to all of Noel's work at the Property because Noel's visited the Property in August 2017, after the execution of the 2017 Noel's Master Subcontract, pursuant to CalAtlantic's request that it investigate and repair its previous work relating to the installation of the fire sprinklers. The 2017 Noel's Master Subcontract states that "Work performed after the date of this Agreement, regardless of whether performed pursuant to a Work Agreement or Work Document issued before or after the date of this Agreement, will be governed by the terms of this Agreement." J.R. 22. However, to the extent that this provision supports the conclusion that Noel's work during its August 2017 visits was governed by the 2017 Noel's Master Subcontract, those visits did not result in any actual repair work performed by Noel's that was alleged to have caused the damages and injuries alleged by Lemma. Moreover, this language cannot be construed, as CalAtlantic argues, to provide that any work performed by a subcontractor before the date of the Agreement, such as Noel's work in 2015, became subject to the 2017 Master Subcontract just because the same subcontractor performed other work after the date of the Agreement. Such an interpretation directly conflicts with the immediately following language stating that "Work performed prior to the date of this Agreement will be governed by the terms of the applicable agreements effective as of the time of performance of such Work." J.R. 22. Accordingly, the Court finds that the indemnification clauses in the 2017 Master Subcontracts do not apply to the allegedly defective work performed by Noel's and Metcalfe.

### B.     The 2015 Subcontracts

In the alternative, CalAtlantic argues that the subcontracts executed in advance of the work performed in 2015, including the Noel's Subcontract, the Peed Subcontract, and the Metcalfe Subcontract, applied to the work performed and effectively require indemnification. The Third-

Party Defendants do not dispute that each of these subcontracts applies to the work they performed at the Property. None, however, contains a general indemnification clause similar to the provision in the 2017 Master Subcontracts.

The Noel's Subcontract states that Noel's "must guarantee all labor and material for a minimum of two (2) years after settlement," which occurred on December 29, 2015, J.R. 4, and that "[i]f field inspection reveals improper material or workmanship," Noel's "will assume all liability for any future charges incurred in the correction of this work." J.R. 4. It also states that Noel's is "responsible for any damages incurred to building or site as a result of work done on site" and that "[a]ny future charges resulting from the repair or replacement of these items is the responsibility of" Noel's. J.R. 4. While there is no dispute that these provisions can be the basis for a finding of liability against Noel's for a breach of contract, the Noel's Subcontract does not include a general indemnification provision like the one in the 2017 Noel's Master Subcontract and, in particular, does not include any provision requiring payment of attorney's fees.

As for Metcalfe, the Metcalfe Subcontract provides that Metcalfe "shall warrant the new home . . . against defects in materials and workmanship" and that Metcalfe agreed to "fully cooperate with Ryland Homes in responding to warranty claims to include field inspections and subsequent repair(s)." J.R. 33. While these and other provisions could form the basis of liability against Metcalfe, they do not amount to a general indemnification provision and do not require that Metcalfe pay attorney's fees to CalAtlantic.

Finally, the Peed Subcontract, the only agreement that Peed had with CalAtlantic, states that Peed "is responsible for any damages incurred to building or site as a result of work done on site," that "[a]ny future charges resulting from the repair or replacement of these items are the responsibility of the Subcontractor," that Peed "guarantee[s] all labor and material for a minimum

21

of two (2) years after settlement," and that "[i]f field inspection reveals improper material or workmanship, subcontractor will assume all liability for any future charges incurred in the correction of this work." J.R. 124–25. As with Noel's and Metcalfe, while these provisions may provide a basis for liability, they do not amount to a general indemnification provision, nor do they provide a basis for payment of attorney's fees. Moreover, it is undisputed that Peed closed its business in March 2015 and that in or around March 2017, Peed satisfied any liability under the warranty by providing a lump sum payment to CalAtlantic.

Based on these facts, the Third-Party Defendants' Motion for Summary Judgment will be granted in part and denied in part. It will be granted as to any claims for indemnification based on the 2017 Noel's Master Subcontract or the 2017 Metcalfe Master Subcontract. It will be denied as to any claims based on the terms of the Noel's Subcontract, the Peed Subcontract, or the Metcalfe Subcontract.

## CONCLUSION

For the foregoing reasons, CalAtlantic's Motion for Partial Summary Judgment will be GRANTED IN PART and DENIED IN PART, Plaintiffs' Cross Motion for Partial Summary Judgment will be GRANTED, and the Third-Party Defendants' Motion for Summary Judgment will be GRANTED IN PART and DENIED IN PART. A separate Order shall issue.

Date: November 28, 2022

THEODORE D. CHUANG
United States District Judge